Gants, J.
On November 19, 1994, Diane Holmes rented a car from the Boston office of the plaintiff, Alamo Rent-A-Car, Inc. (“Alamo”), and designated the defendant Philip Matchem as an authorized driver. On November 27, 1994, Matchem, while driving the rented car, was involved in an accident with another motor vehicle. The driver of that other vehicle and its passenger filed claims for personal injuries and property damage against Alamo arising out of the accident. In view of its deductible under Alamo’s commercial automobile insurance policy with National Union Fire Insurance Company (“National Union”), Alamo paid $17,600 (all but $200 of which was for bodily injury) to resolve those claims. Alamo then filed the instant complaint to recover this amount from Matchem and his automobile insurer, the defendant Arbella Mutual Insurance Company (“Arbella”).
In short, this case squarely presents a single issue: Whose insurer pays for personal injuries and property damage that are suffered by third parties in an accident with a rental car — the rental car company’s insurer or the rental driver’s insurer? Both sides agree that this issue is one of law that is appropriately resolved on summary judgment, and therefore have cross-filed motions for summary judgment. For the reasons detailed below, plaintiff s motion for summary judgment is DENIED and the defendants’ motion for summary judgment is ALLOWED.
DISCUSSION
By statute, “whoever operates or permits to be operated ... a motor vehicle” shall provide and maintain a motor vehicle liability policy or bond. G.L.c. 90, §34J. There is no dispute that Alamo, as a car rental company that permits others, in return for a fee, to operate its motor vehicles, must maintain a motor vehicle liability policy that covers each automobile it rents.[1]
Alamo maintained a commercial motor vehicle liability policy with National Union that included the Massachusetts Mandatory Endorsement, language that the Insurance Commissioner requires to be included in all such motor vehicle policies. Under that Mandatory Endorsement, National Union agreed to pay “all sums the insured legally must pay as damages because of bodily injury caused by a covered auto in Massachusetts accidents.”[2] It further provided:
If a claim is covered by us and also by another company authorized to sell auto insurance in Massachusetts, we will pay only our proportionate share. If the Insured is using a covered auto you do not own at the time of the accident, the owner’s auto insurance pays up to its limits before we pay. Then, we will pay up to the limits for COMPULSORY BODILY INJURY TO OTHERS INSURANCE shown in the declarations for any damages not covered by that insurance.[3]
Endorsement 13 sought to amend the Policy by providing, “(f]or any covered ‘auto,’ this Coverage Form provides insurance that is excess and non-contributing to all other insurance available whether primary, excess, or contingent.”
Matchem at the time of the accident was insured under a Massachusetts personal automobile insurance policy issued by Arbella that provided:
If someone covered under this Part is using an auto he or she does not own at the time of the accident, the owners’ auto insurance must pay its limits before we pay. Then, we will pay, up to the limits shown on your Coverage Selections Page for any damages not covered by that insurance.
Arbella Policy at 11.
In short, the National Union Policy, through Endorsement 13, essentially declares that it will pay up to the compulsory insurance Emits only if no other insurance, whether primary, excess, or contingent, is available. The Arbella Policy essentially declares that *10 it will pay up to the compulsory insurance limits only after the owner’s automobile insurance has paid its limits. This is the insurance equivalent of the old Alphonse and Gaston vaudeville routine in which each urges the other to be the first to walk through the door: “After you my dear Alphonse; After you my dear Gas-ton.” The question for this Court is which insurer the law obliges to walk through the door first.[4]
Where there are conflicts among insurance policies as to whose insurer must pay first, Massachusetts courts attempt to “effectuate the language of the policies at issue.” Mission Ins. Co. v. U.S. Fire Ins. Co., 401 Mass. 492, 496 (1988). There is no “hard and fast rule that in all circumstances and under all policies insurance on the vehicle is primaiy while insurance of the driver is excess.” Id. at 497. Nonetheless, it is plain from the language required by the Insurance Commissioner in the Mandatory Endorsement in the National Union Policy that, with regard to compulsory bodily injury insurance, the owner’s insurer of the vehicle must pay first. This same rule is present in the Arbella Policy, which also adopts the form language approved by the Commissioner. See id. at 497-98. In contrast, with respect to comprehensive insurance coverage, which is optional, Massachusetts law provides that the driver’s insurer pays for any collision damage to a rented or borrowed automobile. G.L.c. 90, §32E 1/2 (B). Indeed, that is why Massachusetts law requires car rental companies who offer collision damage waivers, for an additional fee, to inform their renters that, if they opted for this coverage on their personal automobile policies, they are already covered for collision damage to a rental vehicle, apart from the deductible. G.L.c. 90, §32E 1/2 (B).
Under the standard approved language in the Arbella Policy, Arbella must pay for liability only after the owner’s automobile insurance has paid its limits. Pragmatically, this means that it will pay only if the owner, in violation of the statutory mandate in G.L.c. 90, §34J, is uninsured. The “super-escape clause” in National Union’s Endorsement 13 attempts to trigger this excess insurance clause by making its coverage “excess and non-contributing to all other insurance available whether primary, excess, or contingent.”[5] Yet, pragmatically, this means that Alamo, for all of its authorized drivers who carry their own automobile coverage, seeks to put itself in the same position as the owner of a vehicle who carries no insurance. Indeed, the Arbella insurance coverage becomes “available” (and National Union thereby becomes freed of its obligation to pay) only if the owner of the vehicle is effectively uninsured with respect to the accident.
In Bowers v. Alamo Rent-A-Car, Inc., 965 P.2d 1274 (Haw.Sup.Ct. 1998), this same super-escape provision was examined by the Hawaii Supreme Court in a context similar to the instant case. The Court held:
[T]o reach the result urged by Alamo, we would have to construe the escape clause in Alamo’s rental contract as providing no vehicle liability coverage, thus shifting the entire burden to State Farm. Hawaii law does not allow vehicles to be operated without insurance. Although Alamo’s argument is correct insofar as it asserts that its vehicles would actually have minimum insurance coverage, we hold that it is against public policy for Alamo to acquire coverage for its vehicles in this manner.
Id. at 1277-78. The same finding is appropriate in Massachusetts, for the same reasons.
Alamo argues that the Supreme Judicial Court’s decision in U.S. Fidelity and Guar.Co. v. Hanover Ins. Co., 417 Mass. 651 (1994), compels this Court to find in its favor. In this case, a prospective automobile buyer named Brian Mulvagh took a vehicle owned by Springfield Auto Sales-East, Inc. (“Springfield”) for a test drive, lost control of the vehicle, and hit a telephone pole, injuring his passenger. Springfield had a so-called “garage policy” with Hanover Insurance Company which covered this loss only if “no other valid and collectible automobile liability insurance, either primaiy or excess, ... is available.” Id. at 652. Mulvagh’s insurance policy had essentially the same “other insurance” provision as Matchem’s — that, if someone covered under the insurance was using an automobile he did not own at the time of the accident, the owner’s automobile insurance must pay its limits before Mulvagh’s insurer had an obligation to pay. Id. The Court ruled that Mulvagh, as a result of the super-escape clause in Hanover’s garage policy, was not covered under that policy, and that his personal motor vehicle insurer therefore must pay for the loss. Id. at 658.
The critical distinction between U.S. Fidelity and Guar. Co. and the instant case is that the former involved garage policy coverage and the instant case involves rental car coverage. The public policy considerations which determine whether a super-escape clause should be honored are wholly different for these two types of coverage. In U.S. Fidelity and Guar. Co., the Supreme Judicial Court, citing Appleman’s treatise, found that an escape clause in a garage policy does not violate public policy. Id. at 660 & n. 7. Again citing Appleman, the Court observed that a garage typically makes no representations concerning insurance and “such usage is local and for a limited period of time, and is often an accommodation, as where a customer is provided with a ‘loaner’ while his own vehicle is being repaired, (or is permitted to test drive a vehicle) rather than the primary focus of the garage operation.” Id. at n. 7. Appleman’s treatise sharply distinguishes between garage policies and car rental agency policies as to whether escape policies violate public policy. Appleman declares in the same treatise cited by the Supreme Judicial Court:
Rental agencies occasionally use such [an escape) clause which well could violate public policy, since such organizations use, as part of their appeal, the fact that insurance is provided. If such representations are made, there should be no undisclosed *11 strings attached. Most commonly, these are now found in garage policies which provide “loaners” while an insured’s automobile is being repaired. This is quite a different situation from that of the rental agency which selects, and approves, the driver and collects a fee for his operation, cognizant of the fact that he may drive an unlimited number of miles before the vehicle is returned.
Appleman, supra, §4910 at 457-58. Indeed, Appleman concludes, “So far as garages are concerned, therefore, we may say that escape clauses do not violate public policy; so far as automobile rental agencies are involved, they should not be sanctioned.” Id. at §4906 at 351-52. To the extent that the Supreme Judicial Court found Appleman persuasive as to whether public policy is violated by enforcing escape clauses in garage policies, it should be equally persuaded by his view that similar clauses in rental car policies violate public policy.
Examining the public policy considerations from a different angle, it is plain that any business which permits others to drive its vehicles would want to be able to save on its insurance premium by obtaining an insurance policy with a super-escape clause that provides compulsory liability coverage only if the driver is uninsured. If the law were to allow every business to do this, the result would be a shifting of insurance costs to personal motor vehicle insurance and away from commercial insurance. In short, individuals would pay more for car insurance and businesses would pay less. The law may permit garages to do this because they allow customers to drive their vehicles for only a short time as an accommodation and, if they had to pay the additional premium involved in being the primary insurer, they may decide that this courtesy is simply too expensive to continue. But there is no such societal benefit from allowing rental car companies to shift these costs to their drivers.
Rental car companies are in the business of renting cars; if they must pay a higher insurance premium from being the primary insurer, they will not stop renting cars but will instead either swallow this additional cost or pass it on to the consumer. If they must bear the cost of these higher premiums, they will have every incentive to reduce the number of accidents involving their fleet of vehicles by being more watchful as to who they allow to rent a car and by ensuring that the cars they rent are safe to drive. As a society, we want rental car companies to bear the insurance costs resulting from accidents involving their cars, because we want to provide them with the financial incentive to cut these costs by reducing the number and severity of traffic accidents. Consequently, this Court finds that National Union’s Endorsement 13 is void as violative of public policy. Alamo cannot unilaterally declare itself the insurer of last resort, but must instead be the primary insurer with respect to liability losses caused by the rental vehicles it owns.
ORDER
For the reasons stated above, plaintiffs motion for summary judgment is DENIED and the defendants’ motion for summary judgment is ALLOWED.

his mandate is expressly imposed on motor vehicle lessors under G.L.c. 90, §32E, but this provision does not apply to lessors, like Alamo, who lease vehicles with unlimited mileage provisions. There is no dispute that the agreement between Alamo and Holmes provided for unlimited mileage, so that provision does not apply here.

A covered automobile includes any automobile registered in Massachusetts and described in the declarations. There is no dispute that the rental car here was a covered automobile.

Endorsement 1 of the National Union Policy defines the Named Insured as ”[a]ny Rentee, Lessee or ‘Alamo Authorized Additional Driver’ that is operating a covered ‘auto’ at the time of accident under a written Alamo Rental or Lease Agreement, but only to the Minimum Financial Responsibility Limits required by law.” There is no dispute that Matchem was among the Named Insureds.

While Alphonse and Gaston originally were comic strip characters created by the American cartoonist, Frederick Burr Opper, whose comic strip ran in the first two decades of this century, they were portrayed in vaudeville routines popular during that era.

 A super-escape clause provides that, if other insurance is available to the insured, even excess or contingent insurance, the policy containing the escape clause will pay no benefits. An excess clause provides that, if there is no other insurance available, the policy containing the excess clause will pay no benefits until the limits of the available insurance has been reached. Although Endorsement 13 uses the term “excess,” it is effectively a super-escape clause since the National Union Policy is limited only to provide the minimum limits of compulsoiy coverage and any other available policy, as a matter of law, would also have to provide coverage up to these same limits. See Mission Insurance, supra, 401 Mass. at 502 n. 3; 8A J.A. Appleman & J. Appleman, Insurance Law and Practice §4906, at 345-50 (1981).